IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF FLORIDA
FORT LAUDERDALE DIVISION

BIN SALEM HOLDING COMPANY, LLC,

      Plaintiff,

v.

THOMAS L. BLAIR,

      Defendant.

No. 11-60931-CV-WILLIAMS

**PLAINTIFF'S REPLY MEMORANDUM IN SUPPORT OF ITS
MOTION PURSUANT TO RULE 56(d) TO DENY OR DEFER
BLAIR'S MOTION FOR SUMMARY JUDGMENT**

    Plaintiff, Bin Salem Holding Company, LLC ("Bin Salem"), by its attorneys, pursuant to FRCP 56(d) and LR 7.1, hereby submits its Reply Memorandum in Support of its Motion to Deny or Defer the Motion for Summary Judgment ("Motion") filed by Defendant Thomas L. Blair ("Blair").

**I.    INTRODUCTION**

    Blair's opposition to Bin Salem's Rule 56(d) Motion—like his motion for summary judgment ("MSJ")—grossly mischaracterizes the parties' agreements and the claims and defenses in this action, in an effort to avoid *any* discovery from being taken. But disputed issues of fact abound right now, as the parties' Rule 56(d) moving and responsive papers plainly show. This case is *not* about—as Blair suggests—whether the lender ("PNC") with a secured interest in the Global Aircraft through the 2006 Loan Agreement should have been paid, and by whom.[1] Rather, the dispute involves the much more fundamental question of whether the 2009 transaction contemplated by the Purchase Agreement between Bin and Salem and Blair was effectively and lawfully consummated, including whether Blair complied with all representations and warranties in that Agreement.

---

[1] Capitalized terms not defined herein shall have the meanings attributed to them in Bin Salem's Motion.

{22989132;1}

Bin Salem contends that it did *not* achieve "owner" status of Final Sequel or the Global Aircraft for reasons including Blair's false representations in the Purchase Agreement and the highly unusual (and potentially illegal) manner in which Blair *attempted to hide* (including from PNC) Bin Salem's purported status as owner of Final Sequel and the Global. Blair's efforts in this regard only came to light in late 2010 when the balloon payment to PNC was coming due, and Bin Salem learned that PNC had *not* accepted certain installment payments from Bin Salem. And while Blair contends that Bin Salem could have received the "benefit of its bargain" by making the balloon payment to PNC, this is, simply, false. Payment on the loan to PNC has *no* bearing on whether Bin Salem lawfully owned and possessed Final Sequal and the Global Aircraft. Bin Salem respectfully submits the evidence will show—directly contrary to Blair's contentions—that Blair made false representations to Bin Salem in the Purchase Agreement, made false representations (or omissions of fact) to PNC and others and wrongfully induced Bin Salem to surrender its $11 million Challenger, the net effect of which was that Bin Salem did *not* own Final Sequel, the Global or the Challenger, and thus did *not* receive the benefit of the bargain it believed it struck via the Purchase Agreement. No amount of money paid to PNC changes that fact.

Blair and certain third parties—including PNC, Aero Toy, Insured Aircraft, Gregory Kalinyak/Spitfire and the FAA—are in possession of documents and information that bear directly on these transactions. Bin Salem has no control over these persons and entities (who Blair himself identified as having relevant information), and so discovery is needed so that Bin Salem has a fair and full opportunity to prove its claims and defenses. By asserting that the requested discovery is "irrelevant" and urging this Court to quickly dispose of this case without allowing *any* discovery, Blair ignores his own admissions and contradictory positions, and he misconstrues Rule 56(d).

The facts surrounding Blair's representations and warranties in the Purchase Agreement; Blair's representations and warranties, if any, to the PNC; why PNC did *not* know about the attempted transfer of the Global Aircraft; why PNC refused to accept installment payments from Bin

Salem; how Blair otherwise engineered installment payments to be made; whether the Loan Agreement and applicable U.S. law prohibited PNC from recognizing Bin Salem as the lawful owner of the Global Aircraft; why Blair concealed the transaction from PNC and interfered with the Aircraft's FAA registration; and the extent of Bin Salem's damages arising from its surrender of its Challenger Aircraft, are all necessary to Bin Salem's claims and its defense of Blair's claims. Due process and fundamental fairness mandate that Bin Salem not be deprived of its ability to fully and fairly pursue its claims and defend against Blair's.

## II.   ARGUMENT

### A.   Bin Salem Has Met Its Burden Under Rule 56(d)

As Bin Salem has detailed in its Complaint and Rule 56(d) Motion, the entire Purchase Agreement transaction has been called into question by Blair's subterfuge and attempt to hide the transaction from PNC. Notably, despite having now filed two lengthy briefs in connection with his MSJ, Blair himself has submitted *no* affidavit or any evidence whatsoever, confirming that he informed PNC about Bin Salem's attempted purchase of Final Sequel and acquisition of the Global Aircraft. Nor has he offered any testimony or evidence refuting Bin Salem's allegations that he concocted a scheme to pay PNC indirectly and avoid filing registration statements with the FAA to further conceal the attempted transfer to a non-U.S. citizen. These things would be easy enough for Blair to do, if he could do so truthfully. Clearly he cannot, and the Purchase Agreement transaction was thus poisoned from the outset. Instead, Blair takes the incredible position that whether he informed PNC of the transaction is immaterial, because PNC was allegedly willing to take Bin Salem's money in satisfaction of the balloon payment due on the Loan. But PNC's willingness to take money from Bin Salem cannot *cure* Blair's gross violations of the Purchase Agreement and other misconduct. PNC had and has no ability to effect ownership or possession of either Final Sequel or the Global Aircraft. Put differently, if Bin Salem had paid PNC, it would no more own

{22989132;1}                                                  3

Final Sequel or the Global Aircraft any more than if Bin Salem did not pay PNC. Blair's entire argument is, thus, a red herring of the most significant magnitude.

Blair also relies on his self-serving interpretation of the Purchase Agreement that the attempted transfer of Final Sequel was only a "change in control" of Final Sequel, not a transfer of ownership of the Global Aircraft. Therefore, according to Blair, discovery on whether PNC knew about the transfer and the reasons Blair hid the transaction from PNC is not necessary. But if this case were as simple as Blair suggests, why would he—as Bin Salem alleges and as Blair does not deny or refute—engineer an indirect payment scheme and instruct the Aircraft's title company not to file correct registration documents with the FAA?

Far from being "tired," as Blair asserts, Bin Salem's theory of the case was acknowledged by Judge Lenard, who rejected Blair's theory and ordered the case to proceed to discovery to allow Bin Salem to obtain evidence necessary to prove its claim. *(See* Dismissal Op. at 12.) Accordingly, Bin Salem detailed in the Garvey Affidavit the discovery—from Blair and four specific third-parties, all of which has now been issued—which is necessary to respond to Blair's motion.[2] Blair nevertheless argues that Bin Salem has not met the Rule 56(d) standard because it offered only "bald assertions" of "vague categories and general discovery." Blair obviously misunderstands Rule 56(d) and ignores key discovery identified in the Garvey Affidavit.

Denial or deferral of Blair's MSJ at this stage clearly is appropriate under Rule 56(d). In its Motion, Bin Salem cited numerous analogous cases granting motions filed pursuant to Rule 56(f) [now Rule 56(d)] and holding that denying one's right to discovery on all pertinent issues before

---

[2]  Bin Salem respectfully submits that the detail in Bin Salem's Motion and the Garvey Affidavit *exceeds* the standard required to obtain relief under Rule 56(d). Courts in this Circuit have granted motions to deny or defer even where the party seeking relief under the rule *did not file any affidavit* detailing the documents and information needed. *See, e.g., Snook v. Trust Co. of George Bank,* 859 F.2d 865, 871 (11th Cir. 1988) ("In this Circuit, a party opposing a motion for summary judgment need not file an affidavit pursuant to Rule 56(f) [now 56(d)] of the Federal Rules of Civil Procedure in order to invoke the protection of that Rule"); *Stout v. St. Armour's Lawn Care, LLC,* No. 07-1882, 2008 WL 816818, at *3-4 (M.D. Fla. Mar. 25, 2008) (granting Rule 56(f) motion where no discovery had been issued at the time defendant's motion for summary judgment had been filed and rejecting defendant's argument that plaintiff's discovery requests are a "fishing expedition" to force them to incur unnecessary litigation costs).

{22989132;1}                                                            4

summary judgment is considered is error, particularly in the face of a Rule 56(d) affidavit. *See, e.g., WSB-TV v. Lee,* 842 F.2d 1266, 1269 (11th Cir. 1988) (reversing grant of summary judgment where no discovery had taken place and noting that consideration of motion for summary judgment shortly after parties became at issue in six-months old case was "erroneous"). Blair ignores this binding authority and instead cites to inapplicable cases where no Rule 56(d) motion was even filed.

For example, Blair cites *Reflectone, Inc. v. Farrand Optical Co.,* 862 F.2d 841, 843-44 (11th Cir. 1989), and *Wingster v. Head,* 318 Fed. Appx. 809, 813 (11th Cir. 2009), for the proposition that this Circuit has "repeatedly emphasized the high burden imposed on a party seeking to postpone ruling on a summary judgment motion. . . ." (Resp. at 5-6.) In these cases, however, plaintiffs did not even file Rule 56(f) motions but instead sought time for *additional* discovery *after* discovery had closed. *See Wingster,* 318 Fed. Appx. at 811 (affirming denial of motion for leave to designate expert, where defendant filed motion for summary judgment after closure of fact discovery and plaintiff had been granted multiple motions for extension of time to respond); *Reflectone,* 862 F.2d at 844 (noting that "[a]ppellant does not claim that it made any rule 56(f) motion" and that while "rule 56(f) is infused with a spirit of liberality, the court could not construe "appellant's deliberate silence" to defendant's motion "as a constructive motion under rule 56(4"). With the exception of the *Reflectone* court's acknowledgment that Rule 56(d) should be "liberally" construed, these cases are inapplicable here.[3] Indeed, when Blair filed his MSJ, the discovery cut-off date was still nine months away and the parties had not even exchanged Rule 26 disclosures, much less issued *any* discovery.

---

[3] Blair's remaining case on this point, which he cites to support an inference that the Court needs to balance the movant's demonstrated need for discovery against the burden such discovery would place on the opposing party (Resp. at 5, 19), is similarly unavailing. That case, *Halbert Intl, Inc. v. James,* 157 F.3d 1271, 1280 (11th Cir. 1998), was a qualified immunity case, and as the Eleventh Circuit has specifically acknowledged, "[i]n qualified immunity cases, the Rule 56(f) balancing is done with a thumb on the side of the scale weighing against discovery" because qualified immunity provides "an entitlement not to stand trial or face the other burdens of litigation. . . ." *Halbert,* 157 F.3d at 1280 (internal citation and quotation marks omitted). *Halbert* does not apply here. In any event, far from being "open-ended" or "overly burdensome," the discovery Bin Salem seeks is limited to the documents and information in the possession of the parties and third-parties surrounding the subject transactions. Nothing more, nothing less. Bin Salem should be permitted to pursue these things that are out of its control. *See, e.g., Michael J. Hoover v. Florida Hydro, Inc.,* No. 07-1100, 2008 U.S. Dist. LEXIS 87839, at *14 (E.D. La. Oct. 1, 2008) (rejecting defendant's argument that

{22989132;1}

As the Eleventh Circuit has "often noted, [ ] summary judgment should not be granted until the party opposing the motion has had an adequate opportunity for discovery." *Snook,* 859 F.2d at 870 (noting high fatality rate of summary dispositions at time before facts have been fully developed). Now that Bin Salem has had the opportunity to issue discovery, that discovery should be completed so that an appropriate factual record is developed.

  B. <u>Discovery Concerning PNC's Knowledge of The Attempted Transfer and Blair's Role in the Post-Transaction Payment Scheme Is Critical</u>

Blair complains that the areas of information detailed in the Garvey Affidavit are only "general areas of discovery" that are "not germane" to the MSJ because, according to Blair, the *only* issue in this case is whether PNC was paid. (Resp. at 9-12.) Not true. While that may be Blair's (faulty) theory of recovery on his counterclaim, the principal issue underlying Bin Salem's claim is whether Blair effectively transfer ownership of Final Sequel and the Global Aircraft to Bin Salem, or whether such transfers never lawfully occurred based upon Blair's breaches of the Purchase Agreement and subsequent misconduct. What PNC knew about the transaction, and when it knew such, is material to Bin Salem's claims, given the express representation in the Purchase Agreement.

Blair concedes he knew about the payment scheme—which he explains in detail in his Answer (Blair Ans., D.E. 38 ¶ 6)—but he contends that discovery about such scheme is unnecessary because PNC has been paid and, according to Blair, Bin Salem has not been harmed. But once again, Blair misses the point entirely. Whether or not PNC received the balloon payment is irrelevant to Bin Salem's claim. Bin Salem needs discovery from PNC; Insured Aircraft (who, according to Blair, made the payments to the "intended parties"); Aero Toy (who, according to Blair, brokered the scheme); the FAA; and Blair (who does not explain how he knows the details of this scheme), in order to demonstrate that Bin Salem did not, in fact, receive *the benefit of the bargain it believed it*

---

compliance with third-party subpoena would be unduly burdensome and noting that party is "free to utilize the discovery method it deems appropriate," including third-party subpoenas).

{22989132;1} 6

*was making* via the Purchase Agreement. This will explain why Bin Salem did not make the balloon payment to PNC—i.e., because it learned that Blair had duped it *into* the Purchase Agreement and *out of* the Challenger Aircraft, and Bin Salem, as a result, was *not* the lawful owner of Final Sequel or the Global Aircraft. This discovery will get to the bottom of how and why Blair went to such lengths to hide from PNC (and others) the purported ownership transfer of Final Sequel and the Global Aircraft to Bin Salem. This is relevant to demonstrate that Blair did not lawfully transfer, or ever intend to lawfully transfer, either Final Sequel or the Global Aircraft to Bin Salem. Blair's conduct, however, unlawfully deprived Bin Salem of the trade-in $11 million Challenger Aircraft, and Bin Salem has sustained damages as a result of the loss of that plane.

Bin Salem has, therefore, identified *specific* discovery needed from PNC concerning:

- Whether Blair informed or communicated with PNC about the Purchase Agreement or that the ownership of Final Sequel would purportedly transfer to Bin Salem;

- Negotiation of the Loan Agreement and parties' intent regarding right to transfer possession, ownership or title of Final Sequel or Global Aircraft without PNC's consent;

- Lender's intent regarding representations and warranties in Loan Agreement concerning U.S. citizenship and location of Final Sequel and the filing of registration statements with the FAA (Garvey Aff. ¶9(a)-(d).

PNC's response to the subpoena issued to it is relevant to at least the following *key* issues: (1) whether Blair informed PNC about the Purchase Agreement before signing it and if not, his reasons for doing so; (2) whether Blair's failure to inform PNC about the attempted transfer of Final Sequel breached § 4.1.3 of the Purchase Agreement (that he had all "requisite legal power and authority to . . . sell, transfer and assign the [Final Sequel] Membership Interests"), thus voiding Bin Salem's obligation to perform under the Purchase Agreement; and (3) whether Blair's failure to inform PNC is a breach of § 4.1.7 (that the execution of the Agreement will "not violate any provision of any . . . agreement or other instrument to which . . . [Final Sequel is] a party or by which it or *any of its assets is bound. . . ."* (Agreement §§ 4.1.3, 4.1.7) (emphasis added).

The needed discovery also is relevant to demonstrate that after executing the Purchase Agreement, Blair continued to hold himself out to PNC and others as the sole member of Final Sequel. This is notwithstanding Blair's contradictory position that Bin Salem became the sole member of Final Sequel upon execution of the Agreement. Not so, it turns out. Bin Salem has already identified two documents showing Blair's subterfuge—the January 25, 2011 email from Blair's financial advisor to PNC stating that the loan would be "paid in full," and the February 18, 2011 "Special Power of Attorney" in which Blair held himself out as the sole owner of Final Sequel. (Mot. at Exs. B, E.) Additional corroborating information will further demonstrate that, as Bin Salem alleges, Blair never intended to transfer any ownership interest in Final Sequel or the Global to Bin Salem, and, in fact, took affirmative steps to see that no lawful transfer in ownership was made.

Moreover, Blair's "explanation" of Kalinyak's e-mail stating that the loan balance under the Note "will be paid in full during the third week of February 2011" raises even more factual questions. Blair accuses Bin Salem of being "disingenuous" with the Court by submitting this document. But it was and is, rather, Blair who is being disingenuous. Why is Blair claiming, for example, that Bin Salem was responsible for the balloon payment, yet his representative was informing PNC that Blair would be making such payment? Discovery clearly is needed from Blair, PNC and Kalinyak to answer this question. Instead, Blair insists that Bin Salem and the Court take his word that his advisor's "interest" in the outstanding balance on the Note related only to Blair's role as guarantor, not because Blair intended to pay off the Note. (Resp. at 14.) But Kalinyak's e-mail makes no mention of Blair as "guarantor," and this is obviously an after-the-fact explanation that will not hold up to the scrutiny of cross-examination. Nor should Bin Salem or the Court be required to simply accept Blair's far-fetched explanation for this e-mail, in particular at this early stage of the litigation.[4]

---

[4] Bin Salem's subpoena to Kalinyak seeks documents and information relating to these topics. *(See* Subpoena to G. Kalinyak, attached hereto as Ex. A.)

{22989132;1}                                8

Bin Salem also needs documents and information related to the Pascarella Declaration, on which Blair improperly relies, and which offers Pascarella's after-the-fact interpretation of the Loan Agreement that PNC did not need consent "to effect a change in control of Final Sequel and that PNC "would have accepted" the final balloon payment from Bin Salem. But again, from whom PNC would have accepted the balloon payment in 2011 is irrelevant. What bank *wouldn't* have accepted payment from either Blair and Bin Salem, leaving them to resolve their differences once PNC was paid? In any event, if Bin Salem paid PNC, it would *not* have magically become the owner of Final Sequel or the Global Aircraft, and it would thus not have received the benefit of its bargain.

Even if Pascarella's testimony is relevant and admissible on whether PNC "would have accepted" the balloon payment from Bin Salem, such testimony demonstrates a disputed issue of fact precluding summary judgment. This testimony contradicts Bin Salem's allegation that PNC refused to accept installment payments from Bin Salem, and it refutes Blair's admission that PNC refused and returned at least one installment payment for $889,057.92 made directly by Bin Salem. (Blair Ans., D.E. 38, ¶ 6.) In light of these contradictions, Bin Salem should be permitted to test Pascarella's testimony by first obtaining the records requested in the subpoena issued to PNC and then taking Pascarella's deposition.[5]

Finally, Bin Salem needs discovery relating to Blair's execution, under oath, of the "Special Power of Attorney" stating that he was the Manager of Final Sequel *at the same time* he was claiming to have no interest in the entity and thus no obligation to make the balloon payment (notwithstanding his agent's earlier email to PNC informing it that Blair would be making such payment). Blair's explanation for this contradiction—i.e., that he executed the sworn statement *after* the balloon payment was due and had not been paid and was trying to "mitigate his losses"—is not credible. As

---

[5]  ignores Bin Salem's argument that Pascarella has no standing or ability to provide his "opinion" about the legal construction of the Loan Agreement, such that Pascarella's testimony on this point is inadmissible and should be considered. *(See* Mot. at 18-19.)

{22989132;1}                                             9

PNC's February 3, 2011 letter clearly states, "the Obligations owing to PNC under [the] Agreement and the Note mature and are due and payable in full on February 21, 2011 (the 'Maturity Date')." *(See* Feb. 3, 2011 letter, attached as Ex. B.) Blair's representations thus contradict the Purchase Agreement and Blair's position that he did *not* own Final Sequel at the time the balloon payment was due and thus had no obligation to make it. Bin Salem respectfully submits that the Court must err on the side of *allowing* discovery under these circumstances, in particular where Blair's own records and contradictory statements have sewn substantial confusion.

    **C.    Discovery Concerning Ownership and Registration of the Global and Bin Salem's Damages Based On Its Loss of the Challenger Is Also Material**.

Bin Salem also outlined specific information needed regarding the Global Aircraft's FAA registration and Blair's instruction that Insured Aircraft *not* file appropriate registration documents. (Mot. 15-17.) This, likewise, goes to the heart of the Purchase Agreement transaction and whether ownership of Final Sequel and the Global Aircraft ever lawfully transferred to Bin Salem. Blair's only response is that it was Bin Salem's responsibility, not his, to file the appropriate registration documents. (Resp. at 16-18.) What Blair fails to understand, or what he would like the Court to overlook, is that Bin Salem *could not* file the registration documents because (1) only the "Authorized Signer," which was Blair, may authorize changes to an FAA aircraft registry record, and (2) they required Bin Salem to attest that Final Sequel and the Global Aircraft were owned by a U.S. citizen. *(See* Mot. at 14-15.) Blair cannot credibly assert that filing the amended registration was Bin Salem's responsibility when the LLC Statement *Blair* signed contains six separate references to the requirement that Final Sequel be a U.S. citizen.[6] Blair knew that in order for his scheme to work, Bin Salem must not be able to make any changes to the Global Aircraft FAA records. In any event, even if Bin Salem could have filed the registration statement, there is no reason why it would do so when it

---

[6] Nor can Blair feign ignorance regarding the U.S. citizen requirements and FAA registration requirements for LLCs, which are clearly set forth in the FAA's guidance document on Limited Liability Companies posted on the FAA website, *at* http://www.faa.gov/licensescertificates/aircraft_certification/aircraft_registry/media/LLCINFO.pdf, and of which this Court can take judicial notice. Fed. R. Evid. 201(c); *Martinez v. Bush,* 234 F. Supp. 2d 1275, 1307 n. 36 (S.D. Fla. 2002) (noting court can take judicial notice of information on official government website).

{22989132;1}    10

relied on Blair's representation that no "filing with any federal, state, local or other governmental authority on the part of Seller *or Company,* is required in connection with the consummation of the transactions contemplated" by the Agreement. (Agreement § 4.1.7.)

Blair also ignores Bin Salem's allegations that Blair instructed Insured Aircraft *not* to file the registration because Blair knew that the FAA would notify PNC, as a secured lienholder.[7] As a result of Blair's deliberate conduct in interfering with the filing of the FAA registration, neither the FAA nor PNC recognized Bin Salem as the owner of the Global Aircraft, thus rendering void the entire transaction. Bin Salem thus needs discovery from Insured Aircraft (and from PNC, Blair and Kalinyak) in relation to Blair's concealment of the transaction from PNC and from the U.S. government so that he would remain the owner of Final Sequel and the Global Aircraft.

Finally, although Blair insists that the Court ignore Bin Salem's allegations surrounding the loss of its Challenger Aircraft, Bin Salem identified specific information needed from Aero Toy regarding whether it paid Blair proceeds from the sale of the Challenger, which Bin Salem only relinquished and sold to Aero Toy in exchange for the Global Aircraft, and any amounts paid to Blair. (Garvey Aff. ¶ 14.) The requested information is directly relevant to Bin Salem's claim for damages.

---

[7] The FAA requires a secured lienholder's consent or release regarding any changes to an aircraft's registration or ownership.

{22989132;1}　　　　　　　　　　　　　11

### III. CONCLUSION

For the reasons stated above and in Bin Salem's Motion, Bin Salem requests that Defendant Blair's Motion for Summary Judgment be denied or, in the alternative, that Blair's Motion be deferred while Bin Salem takes discovery necessary to respond to Blair's Motion.

Dated: <u>January 20, 2012</u>

Respectfully submitted,

<u>/s/ Ashley A. Sawyer, Esq.</u>
Marc J. Gottlieb, Esq.
Florida Bar No. 827819
E-Mail: marc.gottlieb@akerman.com
Ashley A. Sawyer, Esq.
Florida Bar No. 0012131
E-Mail: ashley.sawyer@akerman.com
**AKERMAN SENTERFITT LLP**
Las Olas Centre II, Suite 1600
350 East Las Olas Boulevard
Fort Lauderdale, FL 33301
Telephone: (954) 463-2700
Facsimile: (954) 463-2224

James V. Garvey, Esq. (admitted *pro hac vice*)
Jeanah Park, Esq. (admitted pro *hac vice*)
**VEDDER PRICE P.C.**
222 North LaSalle Street, Suite 2600
Chicago, IL 60601-1003
Telephone: (312) 609-7500
Facsimile: (312) 609-5005

*Counsel for Plaintiff*
*Bin Salem Holding Company, LLC*

**CERTIFICATE OF SERVICE**

      I hereby certify that on <u>January 20, 2012,</u> I electronically filed the foregoing with the Clerk of the Court by using the CM/ECF system which will send an electronic notice to the following:

Barry R. Davidson, Esq.
Florida Bar No. 107678
E-Mail: bdavidson@hunton.com
Jamie Zysk Isani
Florida Bar No. 728861
E-Mail: jisani@hunton.com
**Hunton & Williams LLP**
1111 Brickell Ave., Suite 2500
Miami, FL 33131
Telephone: 305.810.2500
Facsimile. 305.810.2460

Attison L. Barnes, III, Esq. (admitted *pro hac vice*)
E-Mail: abarnes@wileyrein.com
Christopher M. Mills (admitted *pro hac vice*)
*E-Mail:* cmills@wileyrein.com
**Wiley Rein LLP**
1776 K Street N. W.
Washington, DC 20006
Telephone: 202.719.7000
Facsimile. 202.719.7049

*Counsel for Defendant*
*Thomas L. Blair*

By: <u>/s/ Ashley A. Sawyer, Esq.</u>
Ashley A. Sawyer
